IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DANIEL CUMMINGS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 09-CV-207-TLW |
| ) | |
| MINNESOTA LIFE INSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

OPINION AND ORDER

Before the Court are the parties' cross motions for summary judgment on plaintiff Daniel Cummings' claim filed pursuant to the Employee Retirement Security Act (ERISA), 29 U.S.C. § 101, *et seq.* against defendant Minnesota Life Insurance Company ("Minnesota Life"). [Dkt. #21, 22]. Plaintiff, as beneficiary, alleges he was improperly denied accidental death benefits under a qualified employee benefit plan sponsored by defendant. In accordance with 28 U.S.C. § 636(c)(1) & (3), the parties have consented to proceed before a United States Magistrate Judge. [Dkt. # 14].

**Standard of Review**

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In order to prevail on a motion for summary judgment, the moving party need not disprove plaintiff's claim; it need only establish that the moving party's factual allegations have no legal significance. Dayton Hudson Corp. v. Macerich Real Estate Co., 812 F.2d 1319, 1323 (10th Cir. 1987). Once the moving party has met its burden, the opposing party may not rely on mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475

U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). In doing so, the party must present more than a mere "scintilla of evidence to satisfy its burden of proving that a factual dispute is genuine." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-52 (1986). A factual issue is genuine "if a reasonable jury could return a verdict for the non-movant." Fed. R. Civ. P. 56(e). In considering a motion for summary judgment, the Court must view the record and draw any inferences in the light most favorable to the party opposing the motion. Kaul v. Stephen, 83 F.3d 1208, 1212 (10th Cir. 1996). Here, there are no material facts in dispute and both parties agree that "this case can be resolved on the Cross Motions for Summary Judgment." [Dkt. # 29 at 1].

**Statement of Undisputed, Relevant and Material Facts**

Based on a review of the pleadings and exhibits, the Court finds that the facts set forth below are material, relevant, and undisputed.

1.       On or about March 16, 2008, plaintiff was in a relationship with Brenda Castro ("Castro"). On that date, Castro was traveling to Oklahoma from Houston, Texas in a Ford pick-up, pulling a small two wheeled trailer containing furniture. While traveling near Calera, Oklahoma, her truck and trailer veered off the road and flipped over in a roadside ditch. [Dkt. # 21, Ex. A]. Castro received small contusions and abrasions. [Dkt. # 21, Ex. B]. She refused medical treatment at the scene of the accident, and she did not seek medical treatment following the accident. [Dkt.# 21, Ex. A, B].

2.       The next day, March 17, 2008, Castro died. She was 52 years old. [Dkt. # 21, Ex. B, E]. An autopsy was performed. The Medical Examiner determined that Castro's death was an accident attributable to ingestion of multiple drugs. The drugs found in Castro's system included hydrocodone, meprobamate, carisoprodol, acetaminophen, and oxycodone. [Dkt. # 21, Ex. B]. The

Medical Examiner reported that the hydrocodone level was within lethal range, and although the level of meprobamate, carisoprodol, acetaminophen and oxycodone were below lethal range, he determined that they could have contributed to her death. [Dkt. # 21, Ex. D].

3. Prior to her death, Castro was employed by J.B. Hunt as an over the road truck driver. [Dkt. # 21, Ex. F]. Castro participated in a qualified employee benefit plan (the "Plan") sponsored by J.B. Hunt and governed by ERISA. The Plan extended coverage to participants in two group insurance policies issued by Minnesota Life. The policies included a Group Term Life Insurance Policy with a benefit of $15,000.00, an Accidental Death and Dismemberment Policy Rider in an additional amount of $15,000.00 (Plan 32500), and a supplemental Group Accidental Death and Dismemberment policy with a benefit amount of $300,000.00 (Plan 32501), (collectively, the "Policies"). [Dkt, # 21, Ex. G, H].

4. Castro named plaintiff as her beneficiary under the Policies. [Dkt. # 21, Ex. J].

5. On August 18, 2008, plaintiff filed claims for both life and accidental death insurance benefits. [Dkt. # 21, Ex. K]. Defendant paid under the life policy but denied plaintiff's claim under the accidental death policies on the grounds that the policy terms did not cover Castro's death. [Dkt. # 21, Ex. L, M].

6. On December 18, 2008, plaintiff filed an administrative appeal from the denial of his accidental death claim under the Policies. [Dkt. # 21, Ex. N].

7. On January 26, 2009, defendant denied plaintiff's appeal and informed plaintiff that it had closed the administrative record. [Dkt. # 21, Ex. O]. The decision to deny benefits was a final administrative decision.

8. Plaintiff filed this case on April 10, 2009.

9.  The interpretation of two provisions in the Policies is at issue in this case, the "accidental death" provision and the "exclusions" provision.

10. The "accidental death" provision provides as follows:

> Accidental death . . .as used in this supplement means that your death . . .results, directly and independently of all other causes, from an accidental injury which is unintended, unexpected, and unforeseen.

[Dkt. # 21-14 at 2, Ex. G].

11. The "exclusions" provision provides as follows:

> In no event will we pay the accidental death. . .benefits where your death . . results from or is caused directly or indirectly by any of the following . . .
>
> > (8) drugs, poisons, gases or fumes, voluntarily taken, administered, absorbed, inhaled, ingested or injected . . .

[Dkt. 21-14 at 2-3, Ex. G].

## Summary of the Parties' Claims

The Court finds, and the parties do not dispute, that the Plan under review does not provide the plan administrator or fiduciary with discretion to determine eligibility for benefits or construe the Plan's terms, as those requirements are defined in Nance v. Sun Life Assurance Co. of Canada, 294 F.3d 1263 (10th Cir. 2002) and Ray v. UNUM Life Ins. Co. of America, 314 F.3d 482, 485 (10th Cir. 2002). Thus, in determining the parties' cross motions for summary judgment, the Court will conduct a *de novo* review of Minnesota Life's denial of accidental death benefits.

Plaintiff argues that Castro's death was an accident, as that term is used in the Policies, and that the term "accident" is unambiguous by the plain meaning of the word. Plaintiff relies on Oklahoma law to define "accident," citing Cranfill v. Aetna Life Ins. Co., 49 P.3d 703 (Okla. 2002), wherein the Oklahoma Supreme Court awarded accidental death insurance benefits to the wife of

an insured who died from injuries received while driving under the influence of alcohol. Based on those facts, the court found that the word "accident" was not ambiguous and held that an accident is an event that is unexpected, unintended, and unforeseen in the eyes of the insured and that the standard to be used is that of a reasonable person appraising the event from the insured's perspective. Based on Cranfill, plaintiff argues that under Oklahoma law, a beneficiary may recover under an accidental death policy, unless it is shown that the death was intentional. [Dkt. # 21 at 6]. Plaintiff claims that Castro ingested prescription and non-prescription medications only to relieve her pain and that she had a reasonable expectation that she would survive, since the drugs had never harmed her before. [Dkt. # 21 at 6].

Plaintiff further contends that the term "drugs," as used in the Policies' exclusion provision, is ambiguous and that defendant's interpretation of "drugs" is overly broad in that it includes both prescription and illegal drugs. [Dkt. # 21 at 6-7]. Plaintiff contends the Court should apply federal common law and cites Padfield v. AIG Life Ins. Co., 290 F.3d 1121 (9th Cir. 2002), wherein the Ninth Circuit "interpret[ed] terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence and experience." Id. at 1125. [Dkt. # 21 at 8]. Plaintiff claims that a person of average intelligence would not interpret the word "drugs" to include prescription drugs legally prescribed to an insured. Plaintiff also looks to Oklahoma law to determine whether death by prescription medication comes within the provisions of an accidental death policy, citing Cooper v. New York Life Ins. Co., 180 P.2d 654 (Okla. 1947). In Cooper, the Oklahoma Supreme Court held that the death of an insured from a morphine injection to relieve pain was unexpected and accidental. The court also held that morphine was not the "taking of poison" under the terms of the policy, because "poison" is some substance or liquid which in small quantities

5

is lethal in its results. [Dkt. # 21 at 9]. Plaintiff claims that a reasonable person would interpret the term "drugs" under an accidental death policy as chemicals taken for a harmful purpose, in the same manner as gases, fumes, and poisons. [Dkt. # 21 at 11].

Defendant, on the other hand, contends that both the accidental death and the exclusion provisions in the Policies are unambiguous. [Dkt. #22 at 6]. Defendant relies on the plain language of the Policies, the amended certificate of death, and the Medical Examiner's Report of Investigation and Report of Autopsy. Id. Defendant contends that under the plain language of the Policies, Castro's death was not an accidental injury which was "unintended, unexpected, and unforeseen." Defendant also contends that because Castro's death was caused by an overdose of multiple drugs which were voluntarily ingested, plaintiff is expressly barred by the plain language in the exclusion provisions. Defendant relies on Webster's Dictionary to define "drugs" as: "(1) a chemical substance used in the treatment, cure, prevention, or diagnosis of disease or to otherwise enhance physical or mental well-being." Webster's Dictionary (Randon House, Inc. 1991). [Dkt. # 22 at 9].

Alternatively, defendant contends that if the word "drugs' is ambiguous, the Court should apply federal common law to interpret the term. Defendant cites Kellogg v. Minnesota Life Ins. Co., 549 F.3d 818 (10th Cir. 2008) in support of this position. Defendant argues that under the federal common law, a court is to ascertain and carry out the true intention of the parties by giving the language its "common and ordinary meaning as a reasonable person in the position of the plan participant . . . would have understood the words to mean." Id. at 830. Defendant contends that the ordinary and popular meaning of the word "drugs" viewed by a person of average intelligence and experience encompasses both prescription and non-prescription drugs and could not be construed to include all drugs except prescription drugs, as espoused by plaintiff. [Dkt. # 22 at 9-10].

6

Defendant relies on Dutka v. Minor, 573 F.3d 210, 212 (5th Cir. 2009), wherein an insured was killed in a plane crash. The insured was the pilot, and the Plan under review excluded accidental death benefits if the loss resulted, in whole or in part, from the insured being under the influence of drugs or intoxicants. The insured pilot had used cocaine, alcohol, and the prescription drug propoxyphene within a few hours of the crash. The Fifth Circuit upheld the decision to deny accidental death benefits, finding that the crash was caused in part by the influence of drugs.

As a final argument, defendant contends that even if the Court construes "drugs" to include all drugs except prescription medication, Cummings has failed to prove that the drugs which caused Castro's death were prescribed by her physician for the injuries she received in her vehicle accident. [Dkt. # 22 at 12].

**Discussion**

The Court is first to determine whether the language at issue is ambiguous. Rasenack v. Tribolet, 585 F.3d 1311, 1318 (10th Cir. 2009). In doing so, an ERISA policy is to be interpreted according to its plain meaning.[1] Id. (citing Kellog, 549 F.3d at 829). However, "the proper inquiry is not what [the provider] intended a term to signify; rather, we consider the common and ordinary meaning as a reasonable person in the position of the plan participant would have understood the words to mean." Id. (quoting Miller v. Monumental Life Ins. Co., 502 F.3d 1245, 1249 (10th Cir.

---

[1] "Terms of an insurance policy must be considered not in a technical but in a popular sense, and must be construed according to their plain, ordinary and accepted sense in the common speech of men, unless it affirmatively appears from the policy that a different meaning was intended." Webb v. Allstate Life Ins. Co., 536 F.2d 336, 339 (10th Cir. 1976). This rule applies equally to ERISA cases governed by federal common law. See Miller v. Monumental Life Ins. Co., 502 F.3d 1245, 1249 (10th Cir. 2007).

2007).[2]  See also Admin. Comm. of Wal-Mart Assocs. Health & Welfare Plan. V. Willard, 393 F.3d 1119, 1123 (10th Cir. 2004).  "Ambiguity exists when a plan provision is reasonably susceptible to more than one meaning, or where there is uncertainty as to the meaning of the term."  Id. (citing Admin. Comm. of Wal-Mart Assoc. Health & Welfare Plan v. Willard, 393 F.3d 1119, 1122 (10th Cir. 2004)).  In addition, all ambiguities in the language of a policy are construed against the insurance company, as drafter of the policy.  "[A]n ERISA provider is required to clearly delineate the scope of its obligations."  Id. at 1319.  Thus, although "the insured has the burden of showing that a covered loss has occurred, [] the insurer has the burden of showing that a loss falls within an exclusionary clause of the policy."  Id. (citing  Pitman v. Blue Cross & Blue Shield of Okla., 217 F.3d 1291, 1298 (10th Cir. 2000)).

**Interpretation of "Unintended, Unexpected, and Unforseen"**

The relevant provisions of the Policies provide that "[a]ccidental death . . . means that your death . . .results, directly and independently of all other causes, from an accidental injury which is unintended, unexpected, and unforeseen."  [Dkt. # 21-14 at 2, Ex. G].  There is nothing ambiguous about the words "unintended, unexpected, and unforseen," and these words are not susceptible to more than one meaning when considered from the perspective of a reasonable person in the position of a plan participant.  The parties do not dispute that Castro's death resulted from her ingestion of five different drugs.  In addition, defendant does not argue that Castro intended, expected, or foresaw that her death would occur when she ingested the drugs.  Rather, defendant argues that because the drug exclusion applies, Castro's death was not an "accident," as defined by the Policies.  The Court disagrees.  Whether or not Castro's death was an "accident" is distinct from the question of whether

---

[2]  Kellogg, a Tenth Circuit case relied on by defendant, cites Miller for the same proposition.  549 F.3d at 830.

or not the exclusion provisions apply, and there is no evidence in the record that Castro intended, expected, or foresaw that her death would result from her actions. Thus, Castro's death, which was directly and independently caused by her drug ingestion, was an accident. Even were this result not clear from the plain language of the Policies, a resort to case law does not alter the result.

The Tenth Circuit has not previously interpreted the words "unintended, unexpected, and unforseen" in the context of an ERISA insurance policy. In the absence of such an interpretation, courts may look to state common law if the state law is consistent with the policies underlying the federal statute in question. Critchlow v. First UNUM Life Ins. Co. of America, 378 F.3d 246, 256 (2nd Cir. 2004). See also Shelter Mutual Insurance Co. v. Wheat, 313 Fed. Appx. 76 (10th Cir. 2008) (unpublished)[3] (looking to Oklahoma law to determine the meaning of the words "accident and accidental" in the context of a non-ERISA insurance policy).

In American Mfrs. Mut. Ins. v. Wodarski, 68 F.3d 483 (10th Cir. 1995), the Tenth Circuit used Oklahoma law to define "accident" within the context of "unexpected, unintended and unforeseen" as "an event that takes place without one's foresight or expectation; an undesigned, sudden and unexpected event, chance, contingency." Id. (unpublished). In addition, the Oklahoma Supreme Court in Cranfill v. Aetna Life Insurance Co., held that "[a] death is not intentionally self-inflicted for purposes of an accidental death policy merely because it resulted from engaging in negligent or even grossly negligent conduct, unless the insured intended to cause his own death. To hold otherwise would be contrary to the expectations of Oklahoma insureds who have purchased accidental death insurance to protect their beneficiaries." 49 P.3d at 709. Because these holdings are not inconsistent with federal ERISA law, they may guide the Court's analysis. Since, as stated

---

[3] Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

9

above, there is nothing in the record to suggest that Castro intended to cause her own death or that she foresaw that her death would occur, the Court agrees with plaintiff that Castro's death was an accident, as that term is used in the Policies, in that it was "unintended, unexpected, and unforeseen."

**Interpretation of "Drugs"**

The Court next considers whether Castro's death by ingestion of multiple drugs falls within the exclusion provisions of the Policies. The exclusion provisions state, in relevant part, that "[i]n no event will we pay the accidental death . . .benefit where the certificate holder's death . . . results from or is caused directly or indirectly by . . .drugs." [Dkt. # 22, Ex. A]. The Court finds this language to be unambiguous. The word "drug" is not uncommon, is not susceptible of more than one interpretation, and its definition can be readily obtained from any dictionary. Merriam-Webster's Collegiate Dictionary and Merriam-Webster's On-Line Dictionary both provide three definitions of the word "drug," one of which is noted as being obsolete. The definitions that are not obsolete are as follows:

> 1: a substance used as a medication or in the preparation of medication, [or] according to the Food, Drug, and Cosmetic Act: (i) a substance recognized in an official pharmacopoeia or formulary, (ii) a substance intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease; (iii) a substance other than food intended to affect the structure or function of the body; (iv) a substance intended for use as a component of a medicine but not a device or a component, part, or accessory of a device[.] . . . 3: something and often an illegal substance that causes addiction, habituation, or a marked change in consciousness.

Merriam-Webster's Collegiate Dictionary, at 355 (10th Ed.); Merriam-Webster's Online Dictionary (http://www.merriam-webster.com/dictionary/drug).[4]

---

[4] Black's Law Dictionary defines the word "drug" as follows: "1. A substance intended for use in the diagnosis, cure, treatment, or prevention of disease. 2. A natural or synthetic substance that alters one's perception or consciousness." Black's Law Dictionary (8th ed. 2004).

10

There is no dispute that the substances taken by Castro fall firmly within the definition of the word "drug."[5]  Likewise, there is no dispute that these substances caused Castro's death. [Dkt. # 22, Ex. C].  Under the plain and unambiguous language of the exclusion provisions, a reasonable person in the position of a plan participant would conclude that the Policies preclude coverage for death caused directly or indirectly by "drugs," irrespective of the type of drugs.  Thus, the exclusion provisions of the Policies apply.

Moreover, even were the Court to accept plaintiff's interpretation that the term "drugs" does not apply to prescription medications (and there is no basis in the language of the policy for such an interpretation), a reasonable person in the position of a plan participant would not extend that interpretation to include prescription medications taken either without a prescription or in a manner that is inconsistent with directions provided by a licensed physician.  There is no evidence in the record, disputed or otherwise, that Castro had a prescription for the drugs she took.  More importantly, assuming Castro had a prescription, she could not have been following the directions provided by her physician, since those directions could not reasonably have directed Castro to take a "lethal" does of hydrocodone.  Thus, the Court concludes that Castro's death comes within the exclusion provisions of the Policies even if the term "drugs" is interpreted to exclude prescription medications.

Finally, even were the Court to accept plaintiff's argument that Cooper v. New York Life

---

[5] Four of the five drugs that caused Castro's death are "controlled dangerous substances" within the definition of "drugs" under the Oklahoma Controlled Dangerous Substances Act, 63 Okl.St. § 2-101, *et seq*.

11

Ins. Co., controls the outcome, the result would not change.[6] In Cooper, "the insured (Conrad E. Cooper) was given hypodermic injections of morphine sulphate . . . in usual quantities, at not too frequent intervals, by proper methods and by skilled persons. . .." Id. at 611. Here, it is undisputed that the insured voluntary ingested a lethal dose of the prescription medication hydrocodone, in combination with non-lethal doses of the prescription medications meprobarnate, carisoprodol, and oxycodone, along with non-lethal doses of the over-the-counter drug acetarminophen. Castro's drug ingestion was not "in usual quantities, at not too frequent intervals, by proper methods and by skilled persons." Rather, Castro's voluntary decision to ingest prescription drugs without first consulting a licensed physician is the undisputed cause of her death. Thus, the Oklahoma Supreme Court's holding that a morphine injection was not the equivalent of "taking of poison" under the terms of the policy has no application here.[7] Accordingly, it is the finding and conclusion of the Court that plaintiff Daniel Cummings is not entitled to the accidental death benefits under the Plan issued by defendant Minnesota Life.

---

[6] Cooper was decided in 1947, prior to the enactment of ERISA.

[7] In any event, defendant is not claiming that the drugs taken by Castro were "poison." Defendant merely claims that the drugs were what they were, which is drugs.

IT IS THEREFORE THE ORDER OF THE COURT that the motion for summary judgment filed by defendant Minnesota Life Insurance Company is hereby granted. [Dkt. # 22].

IT IS THE FURTHER ORDER OF THE COURT that the motion for summary judgment filed by plaintiff Daniel Cummings is hereby denied. [Dkt. # 21].

IT IS SO ORDERED this 3rd day of May, 2010.

T. Lane Wilson
United States Magistrate Judge